RONALD J. TENPAS
**Acting Assistant Attorney General**
**Environment and Natural Resources Division**

ROBIN E. LAWRENCE
**Senior Counsel**
**U.S. Department of Justice**
**Environment and Natural Resources Division**
**Environmental Enforcement Section**
**P.O. Box 7611, Ben Franklin Station**
**Washington, D.C. 20044**
**(202) 514-4112**

ROBIN E. LAWRENCE

MATT M. DUMMERMUTH
**United States Attorney**
**Northern District of Iowa**

ROBERT M. BUTLER
**Assistant U.S. Attorney**
**Northern District of Iowa**

**Attorneys for the United States**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _C07-4045_ |
| ) | |
| MIDAMERICAN ENERGY COMPANY ) | Judge _____ |
| AND THE CITY OF LE MARS, IOWA ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States

and through the undersigned attorneys, acting at the request of the Administrator of the United

States Environmental Protection Agency (EPA), alleges as follows:

## NATURE OF ACTION

1. This is a civil action brought pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. 9607(a). The United States seeks recovery from MidAmerican Energy Company and the City of Le Mars, Iowa (Defendants) of response costs incurred or to be incurred by the United States for response actions taken at or in connection with the release or threatened release of hazardous substances at the Le Mars Coal Gas Superfund Site in Le Mars, Plymouth County, Iowa (the Site). The United States seeks a declaratory judgment, pursuant to CERCLA Section 113(g)(2), 42 U.S.C. 9613(g)(2), declaring that Defendants are liable for any further response costs that the United States may incur with respect to the Site.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1331, 1345 and 42 U.S.C. 9613(b), because the action arises under the laws of the United States; the United States is the plaintiff; and the action is brought by the United States to recover response costs pursuant to Section 107(a) of CERCLA, 42 U.S.C. 9607(a).

3. Venue is proper in this district pursuant to 28 U.S.C. 1391(b), (c) and 42 U.S.C. 9613(b) because the events or omissions giving rise to the claim occurred in this district, the release and threatened releases occurred in this district, the Site is located in this district, and the Defendants reside and/or may be found in this district.

## DEFENDANTS

4. Defendant MidAmerican Energy Company (MidAmerican) is a corporation organized and existing under the laws of the State of Iowa. MidAmerican is the corporate successor,

through merger, to the Iowa Public Service Company.  MidAmerican is similarly the corporate

successor to, among others, Sioux City Gas and Electric Company, Midwest Power Systems Inc,

Midwest Resources Inc., and Midwest Energy Company.

5.  Defendant the City of Le Mars is a municipality located in Plymouth County, Iowa and

a political subdivision of the State of Iowa.

6.  Each Defendant (MidAmerican and the City of Le Mars) at times relevant to this

action is a person within the meaning of CERCLA Section 101(21) who falls within one or more

of the classes of liable persons under CERCLA Section 107(a)(1)-(4), including one or more of

the following: the "owner or operator" of a "facility" or "Site" or portion thereof, the "owner or

operator" at the time of disposal of any hazardous substance, and a person who by contract,

agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for

transport for disposal or treatment, of hazardous substances at the facility or Site.

## STATUTORY FRAMEWORK

7.  Congress enacted CERCLA in 1980 to establish a comprehensive program to enable

the federal government to address a serious nationwide problem of releases and threatened

releases of hazardous substances from thousands of hazardous waste sites. *See* S. Rep. No. 848,

96th Cong., 2d Sess. 13, 17-18 (1980); H.R. Rep. No. 1016, 96th Cong., 2d Sess. Pt. I, at 17-22

(1980).  The principal goals of CERCLA are protecting the public health and welfare by cleaning

up hazardous waste sites, and holding parties responsible for the contamination accountable for

the cost to respond. CERCLA establishes a framework for government action in response to

releases and threatened releases of hazardous substances.

8.  CERCLA Section 104 authorizes the President to take "removal" and "remedial"

actions and "enforcement activities related thereto," which collectively and individually are

known as "response actions," to respond directly to any actual or threatened releases of

hazardous substances into the environment. *See* 42 U.S.C. 9604(a), 9601(23), (24), (25).[1]

9. The procedures for response actions are set forth in both the statute and the national

contingency plan (NCP). *See* 42 U.S.C. 9605; 40 C.F.R. Pt. 300 et seq. (procedures for

hazardous substance response are codified at 40 C.F.R. Subpts. E-J). Congress has established

the Hazardous Substance Superfund to pay for federal response actions. *See* 26 U.S.C. 9507; 42

U.S.C. 9601(11).

10. Congress provided a mechanism in CERCLA for the government to replenish that

fund by recovering all response costs "not inconsistent with the national contingency plan" from

certain classes of liable persons. 42 U.S.C. 9607(a)(4)(A).

11. To establish liability for response costs, the government must show that (1) a release

or threatened release of any hazardous substance has occurred or is occurring; (2) the release or

threatened release is from a "facility" as defined under Section 101(9) of CERCLA; (3) the

release or threatened release has caused the government to incur "response costs"; and (4) the

defendant falls within one or more of the classes of liable persons described under Section

107(a). *See* 42 U.S.C. 9607(a). As to the last element, CERCLA establishes four broad classes

of liable persons: owners or operators of a facility; former owners and operators at the time of

disposal of any hazardous substance at the facility; persons who arranged for disposal or

treatment or arranged with a transporter for transport for disposal or treatment of hazardous

substances at the facility; and persons who transported the hazardous substances and selected the

disposal facility. *See* 42 U.S.C. 9607(a)(1) - (4).

---

[1]  The President has delegated certain authority for administering CERCLA to the Administrator of EPA. *See* Exec. Order No. 12580, 3 C.F.R. 193 (1988 comp.), reprinted in 42 U.S.C. 9615 note. That delegation includes authority for certain enforcement related activities, but provides the Attorney General with authority for all litigation under the Act and requires Attorney General concurrence for other enforcement related activities. Id. at §§ 4, 6.

12. CERCLA Section 113 provides federal courts with jurisdiction for the federal government's cost recovery action. *See* 42 U.S.C. 9613(h)(1). In any such action, the Court "shall enter a declaratory judgment for response costs and damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. 9613(g)(2).

### GENERAL ALLEGATIONS

13. The United States realleges and incorporates paragraph 1 though 12 as if fully set forth herein.

14. The Le Mars Coal Gas Superfund Site (the Site) encompasses approximately 1.6 acres and is located at 331 First Street NE, in the City of Le Mars, Plymouth County, Iowa. The Site is triangular in shape and bordered on the northwest, the hypotenuse of the right triangle, by railroad tracks of the Union Pacific and Canadian National Railroads, on the east by 4th Avenue NE, and on the south by 1st Street NE. Land use adjacent and surrounding the Site includes mixed residential and commercial properties.

15. The Site was operated previously as a manufactured gas plant (MGP) which produced coal gas and associated waste. The Le Mars Gas Light Company constructed and operated the manufactured gas plant (a/k/a a coal gasification plant) from 1884 until roughly the end of the century. The initial plant included, among other things, a production building with a retort room, coal room, lime and meter room, and purifying room; a gas holder; a tar well; and an office building. The Le Mars Gas Light Company dissolved in 1904.

16. The Le Mars Gas Company acquired the plant in 1898. The Le Mars Gas Company owned and operated the Site property and the MGP from approximately 1898 to 1942. During the course of its ownership and operation, the Le Mars Gas Company expanded the plant

operations, including the addition of plant facilities (including oil tanks and a 100,000 cubic foot gas holder) and the eventual conversion of the plant operations from coal gas to carbureted water (oil and water) gas.

17. In 1942, Iowa Public Service Company (IPSC) became the owner and operator of the Site (and facility) when it purchased property that included the Site property, the plant and its structures, and the existing utility operations, including the gas distribution system. Following SEC approval, IPSC acquired the Site, the plant property and the utility operations of Le Mars Gas Company. In 1942, the Le Mars Gas Company transferred, assigned, and set over to IPSC and its successors and assigns its rights and duties (for a period of 25 years) under Ordinance 236, including, but not limited to the right to establish, maintain and operate a gas works plant and a distribution system within the City of Le Mars. In 1963, those rights and duties granted to IPSC, its successors and assigns, were renewed for another twenty-five (25) years by Ordinance 411. The Le Mars Gas Company dissolved in 1942.

18. IPSC modified the Site property and structures, including portions of the MGP, during the time IPSC owned and operated the Site. Among other things, IPSC modified existing buildings, removed certain fixtures from the gas plant, constructed a building, and dismantled existing portions of the manufactured gas plant, including the plant building and gas holders. IPSC, *inter alia*, arranged by contract in March 1953 to demolish the MGP building and certain structures and fixtures ("the old gas plant") and to build a 150' by 72' building in its place.

19. IPSC owned and operated the Site (and facility) from approximately 1942 to August 1953. Following certain plant demolition and building construction activities, IPSC sold most of the Site property to C.W. Miller in August 1953, except the trade fixtures in the old gas plant and a portion of the property described in the final deed, a 20' by 72' building located on the premises.

IPSC leased back the portion of the Site it had sold for a period of twenty (20) years and

continued in possession and operation at the Site until at least 1967. In or around 1962, certain

construction activities occurred, including the following: a perennial ditch traversing the Site that

flows to Willow Creek and the Floyd River was completely covered and a concrete culvert was

constructed at the Site.

20. In September 1967, C.W. Miller sold the property that he owned (the majority of the

Site property), subject to the twenty-year lease with IPSC, to the City of Le Mars, reserving the

same portion that had not been conveyed to C.W. Miller by IPSC – the portion of the property

described in the deed containing a 20' by 72' building.

21. The City of Le Mars is the current owner of that portion of the Site property

conveyed by Miller and uses it for operations of the City's Street Department. The Le Mars

Street Department uses the property for office, maintenance, and storage facilities. The Site now

includes an office and maintenance shop building, two storage buildings, a shed, a gravel

(formerly paved) parking lot, a gas pump, and an above ground waste oil tank. The Site at

relevant times included a tar well and a number of underground storage tanks, some tanks

associated with the manufactured gas plant and others installed in the mid-1980s by the City.

Prior to EPA removal activities, the Site included a tar well and at least three tanks installed by

the City, including a 2000-gallon underground diesel tank, a 12,000-gallon underground gasoline

tank, and a 500- gallon underground waste oil tank.

22. All surface water flows into a perennial drainage ditch at the Site, which is about ten

(10) feet deep. The perennial drainage ditch (previously cutting across the surface of the Site and

traversing the Site, but now covered with a concrete drainage culvert ) extends approximately

south to north underneath the manufactured gas plant Site and empties into an open drainage

ditch.  The drainage ditch flows below the railroad tracks on the northern Site boundary.  Surface

water from the Site also drains into this ditch.  The drainage ditch flows into Willow Creek,

which empties into the Floyd River, a tributary to the Missouri River.

23.  The City of Le Mars uses six municipal wells (well numbers 4, 6, 7, 8, 9, and 10).

Private residential wells are also in use within the city limits of Le Mars.  The nearest municipal

wells, well numbers 4 and 8, are located approximately 2,000 feet downgradient of the Site.  Six

private residential wells are located within one mile of the Site.

24.  In or around 1985, the City of Le Mars installed underground storage tanks (USTs)

for gasoline and/or diesel oil.  During the installation, the City noted and observed contamination

at the Site.  Thirteen-foot deep monitoring wells were installed adjacent to the tanks subsequent

to the installation of the USTs.  The Iowa Department of Natural Resources was informed of

contamination and releases in 1990.

25.  In 1990, the City of Le Mars collected subsurface samples from a soil boring near the

USTs at the Site.  The analytical results associated with the samples were indicative of a UST

leak because they documented the presence of total organic hydrocarbons (TOHs) in

concentrations as high as 2,300 $\mu g/g$.  The results exceeded Iowa Department of Natural

Resources (IDNR) guidelines of 100 $\mu g/g$.

26.  IDNR requested the City to perform pressure tests of the USTs to detect potential

releases of hazardous substances and/or gasoline or diesel fuel.  The tests were performed in

1990.

27.  During the installation of additional monitoring wells at the Site in 1995, the State

detected a strong cresol odor in the soils.  Sampling revealed the presence of carcinogenic and

non-carcinogenic polynuclear aromatic hydrocarbons (PAHs) and total petroleum hydrocarbons

(TPH) (as gasoline and as fuel oil). The State subsequently referred the Site to EPA.

28. Releases and threatened releases of hazardous substances have occurred and are occurring at the Site. Those hazardous substances include coal tar wastes composed of polynuclear aromatic hydrocarbons (PAHs) such as benzo(a)pyrene, naphthalene, anthracene, acenaphthahlene, and phenanthrene; phenolic compounds including phenol and methylphenols; light aromatic compounds such as benzene, toluene and xylenes; various organic compounds such as dibenzofuran; inorganics including cyanide, arsenic, chromium, lead, copper, zinc, iron; various sulfides; ammonia; and nitrates.

29. Releases and threatened releases of hazardous substances occurred at the Site at relevant times from 1884 through 2004, including during the respective time of ownership and/or operation of the Site and/or facility by the City and MidAmerican, including IPSC and certain other predecessor corporate entities that merged into MidAmerican.

30. Disposal of hazardous substances occurred at the Site at times relevant to this action, including during operation of the MGP and/or facility, during construction and demolition activities at the Site or facility, and during the respective times of ownership and/or operation of the Site and/or facility by the City and MidAmerican, including IPSC and certain other predecessor corporate entities that merged into MidAmerican.

31. EPA has conducted response actions at the Site pursuant to CERCLA Section 104, 42 U.S.C. 9604, to evaluate and address the releases and threatened releases of hazardous substances at the Site.

32. In 1995, EPA conducted a Preliminary Assessment at the Site, confirming releases and threatened releases of hazardous substances in the soils and groundwater, including PAHs and TPHs.

33.  In 1997, EPA conducted a Site Investigation at the Site.  The Site Investigation confirmed releases and threatened releases of hazardous substances at the Site from soils and groundwater, including volatile and semi-volatile organic compounds (VOCs and SVOCs), carcinogenic and non-carcinogenic PAHs, metals, and cyanide.  The investigation documented contamination of the groundwater, surface and subsurface soil, and sediment. Sampling results confirmed releases and threatened releases and elevated levels of hazardous substances at the Site, including (1) carcinogenic PAHs such as benzo(a)anthracene, benzo(b)fluoranthene, benzo(k)fluoranthene, benzo(a)pyrene, chrysene, dibenzo(a,h)anthracene, indeno(1,2,3-cd) pyrene; and other toxic and probable carcinogenic PAHs such as phenanthrene, and pyrene (which EPA has not yet definitively classified because the data reviewed contained no human data and inadequate animal bioassays that are decades old); (2) VOCs such as benzene, toluene, ethyl benzene, acetone, carbon disulfide, methyl ethyl ketone, styrene, and xylene; (3) SVOCs such as naphthalene, 2-methylnaphthalene, phenol, 2-methylphenol (o-cresol); 4 methylphenol (p-cresol); carbozole; and dibenzofuran; (4) metals and inorganics such as manganese, copper, cadmium, arsenic, lead, and cyanide.

34.  In 2000, EPA conducted an Expanded Site Investigation at the Site, which included installation of twelve (12) groundwater monitoring wells, sampling soil, sediment, and surface water, and further evaluation of the threat to human health and the environment.  Sampling confirmed releases and threatened releases of hazardous substances (including VOCs, SVOCs, PAHs, and metals) at and from the Site.  Samples from the monitoring wells indicated that VOCs, including benzene and toluene, PAHs and cyanide have migrated off-site in the shallow aquifer.  Sediment samples taken from the drainage ditch indicated elevated PAH levels, including benzo(a)pyrene.  EPA detected elevated levels of the following in surface and

subsurface soils on-site as well as at an adjacent residence: PAH levels, including naphthalene,

benzo(a)anthracene, benzo(a)pyrene, and indeno(1,2,3-cd)pyrene; VOC levels, including

benzene, toluene, ethyl benzene, and xylene; and cyanide levels. Soil samples revealed high

contamination of soils at locations where former manufactured gas plant structures, including

the gasometer, gas holders and tar well, were located.

35. In 2003, EPA completed an Engineering Evaluation/Cost Analysis (EE/CA) to

identify and evaluate proposed removal action alternatives to address the contamination at the

Site, including the benzene and total B(a)P equivalents-contaminated soil and groundwater and

other hazardous substances at the Site.

36. On September 26, 2003, EPA issued an Action Memorandum authorizing a non-time

critical removal action at the Site, pursuant to CERCLA Section 104, 42 U.S.C. 9604, and NCP

Section 300.415, 40 C.F.R. § 300.415. On April 24, 2004, EPA commenced the removal action

to addresses releases and threatened releases of hazardous substances at the Site, including

benzene, toluene, ethylbenzene, xylenes (BTEX) and polycyclic aeromatic hydrocarbons (PAHs).

The removal action includes, but is not limited to, excavation down to the water table of

approximately 14 feet of contaminated soil, thermal treatment or disposal of waste materials in a

RCRA Subtitle D Landfill, backfill of excavated areas, and removal of certain structures,

including Gas Holders A and B, the tar well, the 12,000-gallon UST, two 6,000-gallon oil tanks,

and one 2,000-gallon UST. On May 12, 2004, EPA issued an Action Memorandum

Amendment, authorizing all contaminated soil to be sent to an offsite thermal treatment facility.

EPA expects to monitor and evaluate the removal action (including the actions of the City under

an Administrative Order) to ensure the effectiveness and integrity of those response actions, and

to determine whether the response actions are sufficiently protective of human health and the

environment.  EPA has not determined the extent of additional response actions that may be undertaken at the Site.

37.  PAHs are hazardous substances within the meaning of CERCLA Section 101(14), 42 U.S.C. 9601(14), and comprise a class of compounds that includes, but is not limited to, naphthalene, benzo(a)anthracene, benzo(a)pyrene, and indeno(1,2,3-cd)pyrene.  PAHs may be toxic to humans and animals via oral, dermal, or respiratory routes of exposure.  As environmental pollutants, PAHs are slightly to moderately soluble in water and are soluble in other organic compounds such as benzene.  Some PAHs are animal carcinogens.  Some PAHs are probable human carcinogens.

38.  Benzene, toluene, ethyl benzene, and xylene (BTEX), light aromatic hydrocarbons detected at the Site, are hazardous substances within the meaning of CERCLA Section 101(14), 42 U.S.C. 9601(14).  Benzene is a human carcinogen.  These compounds may be toxic to humans and animals via oral, respiratory, or dermal routes of exposure.  They are slightly soluble in water and volatile in the environment.

39.  VOCs are hazardous substances within the meaning of CERCLA Section 101(14), 42 U.S.C. 9601(14).  Chlorinated VOCs are widely used as solvents and evaporate easily.  These compounds may be toxic to humans and animals via oral, dermal, or respiratory routes of exposure.  Some chlorinated VOCs are animal carcinogens.  Some chlorinated VOCs are probable human carcinogens.

40.  Releases or threatened releases of hazardous substances have occurred and are occurring at the Site within the meaning of CERCLA Section 101(14), (22), 42 U.S.C. 9601(14), (22).  The Le Mars Coal Gas Superfund Site (the Site) is a location where hazardous substances have been deposited, stored, disposed of, placed or otherwise come to be located, and thus is a

"facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. 9601(9).

41. EPA determined that the releases and threatened releases of hazardous substances and conditions at the Site presented an imminent and substantial endangerment to public health or welfare and the environment.

42. EPA issued an Administrative Order on Consent (Order) in February 2005, pursuant to CERCLA Sections 104, 106(a), and 122, 42 U.S.C. 9604, 9606(a), and 9622 (and consistent with delegations of authority to the Administrator of EPA by Executive Order No 12580, January 23, 1987, 52 Fed. Reg. 2923, and further delegations to EPA Regional Administrators by EPA delegation No 14-14-C, and delegations by the Regional Administrator for EPA Region 7 to the Director of the Superfund Division, EPA Region 7 by EPA Delegation No. R7-14-14-C). The Order, entered into voluntarily by the City of Le Mars, provides for the performance of certain response actions by the City in coordination with EPA's Non-Time-Critical Removal Action at the Site.

43. EPA has notified the State Iowa of this action, including negotiations with the PRPs and the Administrative Order on Consent, pursuant to CERCLA Sections 106 and 121, 42 U.S.C. 9606 and 9621, and 40 C.F.R. 300.520(a) and 300.525(e). EPA notified the State of Iowa (IDNR) on June 23, 2004, concerning negotiations with the potentially responsible parties and the Administrative Order; EPA again notified the State of the proposed action and Consent Decree negotiations on September 27, 2006.

## CLAIM FOR RELIEF

44. The United States realleges and incorporates paragraph 1 though 43 as if fully set forth herein.

45. A "release" or "threatened release" of a "hazardous substance" has occurred or is occurring within the meaning of CERCLA Section 101(14) and (22) and 107(a), 42 U.S.C. 9601(14), (22); 9607(a).

46. The release or threatened release has occurred or is occurring at or from a "facility" within the meaning of CERCLA Section 101(9), 42 U.S.C. 9601(9).

47. The United States has incurred and continues to incur "response costs," within the meaning of Section 101(25) of CERCLA, 42 U.S.C. 9601(25), responding to the releases and threatened releases at or from the facility (or Site).

48. Each defendant is a "person," within the meaning of CERCLA Section 101(21) of CERCLA, 42 U.S.C. 9601(21), that falls within one or more of the classes of liable persons under CERCLA Section 107(a)(1)-(4), 42. U.S.C. 9607(a)(1)-(4).

49. Pursuant to Section 107(a) of CERCLA, 42 U.S.C. 9607(a), the Defendants are each jointly and severally liable for all response costs incurred and to be incurred by the United States in connection with the Site, including enforcement costs and prejudgment interest on all response costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, respectfully request that this Court:

1. Enter judgment, pursuant to CERCLA Section 107(a), 42 U.S.C. 9607(a), in favor of the United States and against Defendants, jointly and severally, for all response costs incurred by

the United States in connection the Le Mars Coal Gas Superfund Site, and issue an Order directing Defendants to pay all such costs, including prejudgment interest and enforcement costs;

2. Enter a declaratory judgment on liability, pursuant to CERCLA Sections 107(a) and 113(g)(2), 42 U.S.C. 9607(a); 9613(g)(2), in favor of the United States and against Defendants, jointly and severally, that will be binding in any subsequent action or actions to recover further response costs or damages at the Le Mars Coal Gas Superfund Site;

3. Award the United States its costs and expenses of this action; and

4. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,
FOR THE UNITED STATES


RONALD J. TENPAS
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


ELLEN M. MAHAN
Deputy Section Chief
Environmental Enforcement Section


ROBIN E. LAWRENCE
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C.  20044
(202) 514-4112/Fax: (202) 514-4180
Robin.Lawrence@usdoj.gov

MATT M. DUMMERMUTH
United States Attorney
Northern District of Iowa


ROBERT M. BUTLER
Assistant U.S. Attorney
Northern District of Iowa
401 First Street SE, Suite 400
Cedar Rapids, IA  52401-1825
(319) 363-6333
Fax: (319) 363-1990
Bob.Butler@usdoj.gov

OF COUNSEL:

Alyse Stoy
Assistant Regional Counsel
Office of Regional Counsel
U.S. EPA Region 7
901 North 5th Street
Kansas City, Kansas 66101